# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: June 21, 2018

**NO. A-1-CA-34986**

**STATE OF NEW MEXICO,**

 Plaintiff-Appellee,

v.

**JOSEPH BLEA,**

 Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Judith K. Nakamura, District Judge**

Hector H. Balderas, Attorney General
Santa Fe, NM
M. Victoria Wilson, Assistant Attorney General
Albuquerque, NM

for Appellee

Bennett J. Baur, Chief Public Defender
Nina Lalevic, Assistant Appellate Defender
Santa Fe, NM

for Appellant

**OPINION**

**VIGIL, Judge.**

{1}     Defendant Joseph Blea was convicted of multiple counts of first degree criminal sexual penetration and first degree kidnapping involving four separate victims in two separate district court cases, and appeals. In both appeals, cause no. A-1-CA-34986 and A-1-CA-35085, Defendant contends that New Mexico's DNA Identification Act (the Act) NMSA 1978, §§ 29-16-1 to -13 (1997, as amended through 2013) is unconstitutional on its face, and on our own motion we consolidated the appeals. We hold that the Act is not unconstitutional on its face, and summarily reject Defendant's remaining contentions. We therefore affirm the judgment and sentence in both cases.

**I.     BACKGROUND**

**A.     Cause No. A-1-CA-34986**

{2}     On November 2, 1988, A.W. (Victim 1), who was 13 years old, went to her home after school where an unknown man wearing a ski mask was lying in wait, armed with a knife. The man vaginally penetrated Victim 1, and then forced her into the bathroom. After securing the bathroom door so Victim 1 could not escape, the unknown man fled. Victim 1 was taken to the hospital, where a rape kit was obtained and evidence was collected from her. The rape kit and evidence were subsequently

analyzed by the Albuquerque, New Mexico Police Department (APD) crime lab, and a DNA profile was obtained which was not Victim 1's. The foreign DNA profile was entered into the Combined DNA Index System (CODIS) database, but no matches were found. After this initial investigation, the case was closed pending further leads because no person was identified as the perpetrator.

{3} Almost twenty years later, on August 13, 2008, Bernalillo County Sheriff's Department (BCSD) deputies were dispatched to Defendant's home to investigate a violent domestic dispute, and arrested Defendant for aggravated assault against a household member and aggravated battery against a household member. Pursuant to the Act, a buccal cell swab was administered to Defendant at the Bernalillo County Metropolitan Detention Center to obtain a DNA sample. The resulting DNA profile was then entered into the CODIS computer database system. Prosecutors subsequently dismissed the domestic violence charges.

{4} On January 13, 2009, APD Detective Sally Dyer was informed of a CODIS database match involving Victim 1's 1988 criminal sexual penetration and foreign DNA collected from a known prostitute who was murdered in Albuquerque in 1985. Defendant was identified as the individual whose DNA matched the foreign DNA in the two cases. However, no arrest was made because APD detectives continued investigating Defendant for almost another year, as a suspect in the disappearance and

death of eleven women and a fetus between 2003 and 2006—crimes colloquially referred to as the "West Mesa" killings.

**{5}** On December 4, 2010, Detective Dyer obtained a search warrant for a buccal cell swab from Defendant to be analyzed and compared to the foreign DNA profile collected in Victim 1's criminal sexual penetration case as well as other evidence APD detectives had obtained in connection with the West Mesa killings. Based on the DNA profile obtained as a result of the search warrant, APD forensic scientist, Donna Manogue, determined that Defendant could not be excluded as the source of the foreign DNA taken from Victim 1 in 1988. Defendant was charged with one count of criminal sexual penetration in the first degree, contrary to NMSA 1978, Section 30-9-11(D) (2009), and one count of kidnapping, contrary to NMSA 1978, Section 30-4-1 (2003).

**{6}** On the day of jury selection, Defendant said that he wanted to waive his appearance at trial because he felt he had no defense, other than those raised by pretrial motions which had already been denied. There was discussion about possible alternatives on how to proceed, and ultimately, it was agreed that the case would be tried to the jury on stipulated facts in Defendant's absence. Defendant signed a waiver of appearance, waiving his right to appear at "all proceedings in this case" and "trial" which the district court approved. A jury was selected, and opening instructions were

3

given to the jury.

{7}     The following morning, the district court was advised that the parties had agreed to a set of stipulations, and that Defendant still did not want to be present at trial. It was agreed that the court would read the stipulation of facts to the jury, and by doing so, Defendant would not waive his right to appeal. The stipulation of facts was formally agreed upon, and signed by counsel. Defendant also signed the stipulation of facts stating that:

> I have read and understand the above [stipulation of facts]. I have discussed this case and my constitutional rights with my lawyers. I understand that by agreeing to these stipulated facts above, I am agreeing [that] these facts will be presented to the jury as if they came in through the testimony of the state's witnesses. I voluntarily, knowingly and intelligently agree to this stipulation of facts without waiving any prior legal objections I have made in this case. I understand that a stipulation is an agreement that a certain fact is true.

The parties gave opening statements; the stipulation of facts was read to the jury; exhibits were admitted into evidence by stipulation; the court gave instructions to the jury; the parties gave closing statements; the jury retired to deliberate; and the jury then returned its guilty verdicts in open court. Defendant appeals.

**B.     Cause No. A-1-CA-35085**

{8}     In 2010 and 2011 APD Detectives asked APD forensic scientists to analyze and compare the DNA sample taken from Defendant pursuant to the December 4, 2010 search warrant to foreign DNA samples retrieved from three other victims of criminal

4

sexual penetration which occurred in 1990 and 1993. The APD forensic scientists determined that Defendant could not be excluded as the source of the foreign DNA sample taken from the anal swab from K.H. (Victim 2), and vaginal swabs from A.M. (Victim 3) and L.O. (Victim 4). As a result, Defendant was charged in a subsequent indictment with six counts of criminal sexual penetration in the first degree, contrary to Section 30-9-11(D), and kidnapping of Victim 2, contrary to Section 30-4-1; three counts of criminal sexual penetration in the first degree, contrary to Section 30-9-11(D), and one count of kidnapping of Victim 3, contrary to Section 30-4-1; and two counts of criminal sexual penetration in the first degree, contrary to Section 30-9-11(D), and one count of kidnapping of Victim 4, contrary to Section 30-4-1.

{9}     Defendant then entered into a conditional plea and disposition agreement approved by the district court in which Defendant agreed to plead no contest to two counts of criminal sexual penetration in the first degree of Victim 2; two counts of criminal sexual penetration in the first degree of Victim 3; and one count of criminal sexual penetration in the first degree and one count of kidnapping of Victim 4. The plea was conditioned on Defendant reserving his right to appeal: (1) whether the Act is constitutional under the Fourth Amendment and the New Mexico Constitution; (2) whether the statute of limitations was improperly applied to his case; and (3) whether the December 4, 2010 search warrant was defective, as not being issued by an

impartial magistrate. With regard to these issues, the parties also agreed that all pertinent pleadings, arguments and rulings made in cause no. D-202-CR-2010-04089 (cause no. 4089) were deemed to be incorporated and binding in cause no. D-202-CR-2013-01243 (cause no. 1243), and the parties entered into a stipulation of facts (SOF) which Defendant agreed would constitute the uncontested facts on appeal. Defendant appeals.

**II.     Constitutionality of the DNA Identification Act**

{10}     In 1994, Congress enacted legislation authorizing the Federal Bureau of Investigation (FBI) to establish an index of DNA samples. Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, 108 Stat. 1796, 2065 (codified, as amended at 34 U.S.C. §§ 12101 to 12643 (2012)). Under this authority, the FBI created CODIS, which "allows State and local forensics laboratories to exchange and compare DNA profiles electronically in an attempt to link evidence from crime scenes for which there are no suspects to DNA samples of convicted offenders on file in the system." H.R. Rep. No. 106-900, pt. 1 at 8 (2000), *reprinted in* 2000 U.S.C.C.A.N. 2323, 2424.

{11}     New Mexico elected to participate in CODIS with the adoption of the Act in 1997. 1997 N.M. Laws, ch. 105. The Act provides for the "collection, storage, DNA testing, maintenance and comparison of samples and DNA records for forensic

purposes" and it specifies that procedures "shall meet or exceed the provisions of the federal DNA Identification Act of 1994 regarding minimum standards for state participation in CODIS, including minimum standards for the acceptance, security and dissemination of DNA records[.]" 1997 N.M. Laws, ch. 105, § 4(B)(1).

{12}     The Act originally only required convicted felons to provide DNA samples for inclusion in the DNA identification system. 1997 N.M. Laws, ch. 105, § 2(A) (stating that a purpose of the Act is to "establish a DNA identification system for covered offenders"); 1997 N.M. Laws, ch. 105, § 3(D) (defining a "covered offender" to mean "any person convicted of a felony offense as an adult under the Criminal Code, the Motor Vehicle Code or the constitution of New Mexico or convicted as an adult pursuant to youthful offender or serious youthful offender proceedings under the Children's Code[.]"); 1997 N.M. Laws, ch. 105, § 6 (requiring "covered offenders" to provide DNA samples).

{13}     In 2006 the Act was expanded to require persons eighteen years of age or older who were arrested for the commission of specified felony offenses to provide a DNA sample to jail or detention facility personnel "upon booking." 2006 N.M. Laws, ch. 104, § 1(A). The felonies specified were sex offenses defined as felonies and all other felonies involving death, great bodily harm, aggravated assault, kidnapping, burglary, larceny, robbery, aggravated stalking, use of a firearm or an explosive, or a violation

7

of the Antiterrorism Act. 2006 N.M. Laws, ch. 104, 1(D)(3)(b). The DNA of these arrestees was included in the DNA identification system. *See id.* § 2(A) (stating that an additional purpose of the Act is to establish a DNA identification system for individuals arrested for the specified felonies).

{14}     In 2011, the Legislature further expanded the Act to require any person eighteen years of age or older "who is arrested for the commission of a felony" to "provide a DNA sample to jail or detention facility personnel upon booking." 2011 N.M. Laws, ch. 84, § 1(A). However, the DNA sample may only be included in the DNA identification system if "the arrest was made upon an arrest warrant for a felony;" or the defendant had "appeared before a judge or magistrate who made a finding that there was probable cause for the arrest;" or "the defendant posted bond or was released prior to appearing before a judge or magistrate and then failed to appear for a scheduled hearing." 2011 N.M. Laws, ch. 84, § 1(B)(1)-(3). In all other cases, the DNA sample collected from a person arrested "shall not be analyzed and shall be destroyed." 2011 N.M. Laws, ch. 84, § 1 (B).

{15}     This case concerns the Act as it existed following the 2006 legislation, and is codified as NMSA 1978, §§ 29-16-1 to -13 (2007). The current Act includes the changes made in 2011 and is codified as Section 29-16-1 to -13 (2013).

## A. Defendant's Motions To Suppress

{16} Defendant filed motions to suppress the DNA evidence collected from him in connection with his arrest for domestic violence in 2008, arguing that the seizure of his DNA pursuant to the Act violated the Fourth Amendment to the United States Constitution and Article II, Section 10 of the New Mexico Constitution. After a hearing at which only legal arguments were presented, the district court denied Defendant's motions.

## B. Standard of Review

{17} Defendant does not contend that the Act is unconstitutional as applied in any particular respect. His argument is that the Act, which requires all persons arrested for certain crimes to provide a DNA sample, is unconstitutional on its face. As such, Defendant has the burden to demonstrate that there is no potential set of facts to which the Act can be constitutionally applied. *See State v. Murillo*, 2015-NMCA-046, ¶ 4, 347 P.3d 284. In other words, Defendant must demonstrate that in all of its applications, the Act is unconstitutional. Moreover, because we presume the Act is valid, we will uphold it against the constitutional challenge "unless we are satisfied beyond all reasonable doubt that the Legislature went outside the bounds fixed by the Constitution" in its enactment. *Id*. (internal quotation marks and citation omitted).

## C. Fourth Amendment Arguments

{18}  Defendant contends that the seizure of his DNA upon his arrest in 2008 violated the Fourth Amendment to the United States Constitution. Defendant's argument was rejected by the United States Supreme Court in *Maryland v. King*, 569 U.S. 435 (2013).

{19}  In *King*, in 2003 a man concealing his face broke into a woman's home in Maryland, armed with a gun, and raped her. *Id.* at 439-40. Although the police were unable to identify or apprehend the perpetrator, DNA of the perpetrator was collected from the victim. *Id.* at 440. In 2009 the defendant was arrested and charged with "first- and second-degree assault for menacing a group of people with a shotgun." *Id.* The defendant's DNA was collected via buccal swab in the course of the routine booking procedures in Maryland for "serious offenses[.]" *Id.* The defendant's DNA matched the DNA taken from the victim in 2003. *Id.* at 441. Although additional DNA samples were taken from the defendant and used against him at the rape trial, "there seems to be no doubt that it was the DNA from the cheek sample taken at the time he was booked in 2009 that led to his first having been linked to the rape and charged with its commission." *Id.* at 440. The Court of Appeals of Maryland reversed the defendant's conviction, determining that the 2009 DNA sample taken from the defendant was an unlawful search and seizure under the Fourth Amendment as "an

10

unreasonable search of the person." *Id.* The U.S. Supreme Court reversed, holding that:

> DNA identification of arrestees is a reasonable search that can be considered part of a routine booking procedure. When officers make an arrest supported by probable cause to hold for a serious offense and they bring the suspect to the station to be detained in custody, taking and analyzing a cheek swab of the arrestee's DNA is, like fingerprinting and photographing, a legitimate police booking procedure that is reasonable under the Fourth Amendment.

*Id.* at 465-66.

{20}    The Court first determined that the administration of a buccal swab, which "involves wiping a small piece of filter paper or a cotton swab similar to a Q-tip against the inside cheek of an individual's mouth to collect some skin cells[,]" is a search for purposes of the Fourth Amendment. *Id.* at 444-446 (internal quotation marks and citation omitted). "It can be agreed that using a buccal swab on the inner tissues of a person's cheek in order to obtain DNA samples is a search. Virtually any intrusion into the human body, will work an invasion of cherished personal security that is subject to constitutional scrutiny[.]" *Id.* at 446 (alteration, internal quotation marks, and citations omitted); *see Schmerber v. California*, 384 U.S. 757, 767 (1966); *see also Missouri v. McNeely*, 569 U.S. 141, 148 (2013) (holding that the taking of blood to determine alcohol content in connection with arrest for driving under the influence of liquor is a search under the Fourth Amendment); *Skinner v. Ry. Labor*

11

*Execs' Ass'n*, 489 U.S. 602, 616-18 (1989) (holding that administration of a "breathalyzer test, which generally requires the production of alveolar or 'deep lung' breath for chemical analysis" is a search under the Fourth Amendment); *Cupp v. Murphy*, 412 U.S. 291, 295 (1973) (holding that scraping of an arrestee's fingernails to obtain trace evidence is a search under the Fourth Amendment).

{21}     However, "[t]o say that the Fourth Amendment applies here is the beginning point, not the end of the analysis." *King*, 569 U.S. at 446. "Reasonableness is always the touchstone of Fourth Amendment analysis, and reasonableness is generally assessed by carefully weighing the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Cty. of Los Angeles v. Mendez*, 137 S. Ct. 1539, 1546 (2017) (alteration, internal quotation marks, and citations omitted). Thus, *King* proceeded by weighing "the promotion of legitimate governmental interests against the degree to which the search intrudes upon an individual's privacy." 569 U.S. at 436, 448 (alteration, internal quotation marks, and citation omitted).

{22}     The U.S. Supreme Court recognized that various governmental interests are legitimately served by collecting the DNA of an arrestee for a "serious offense" under Maryland's statute during a routine booking procedure. *Id.* at 448. "The legitimate government interest served by the Maryland DNA Collection Act is one that is well

12

established: the need for law enforcement officers in a safe and accurate way to process and identify the persons and possessions they must take into custody." *Id.* at 449. This interest is best understood as having its origin in the lineage of cases pertaining to the " 'routine administrative procedures at a police station house incident to booking and jailing the suspect' " in which " 'the law is in the act of subjecting the body of the accused to its physical dominion.' " *Id.* at 449-50 (alteration omitted) (quoting *Illinois v. Lafayette*, 462 U.S. 640, 643 (1983), and quoting *People v. Chiagles*, 237 N.Y. 193, 197 (1923) (Cardozo, J.)).

{23}    First, this means that " '[i]n every criminal case, it is known and must be known who has been arrested and who is being tried.' " *King*, 569 U.S. at 450 (quoting *Hiibel v. Sixth Judicial Dist. Court of Nev., Humboldt Cty.*, 542 U.S. 177, 191 (2004). DNA testing identifies with "near certainty" the identity of a person by analyzing "noncoding" regions of DNA material in chromosomes. *King*, 569 U.S. at 442-43. "[F]orensic analysis focuses on 'repeated DNA sequences scattered throughout the human genome,' known as 'short tandem repeats' (STRs). The alternative possibilities for the size and frequency of these STRs at any given point along a strand of DNA are known as 'alleles,' and multiple alleles are analyzed in order to ensure that a DNA profile matches only one individual." *Id*. at 443 (quoting J. Butler, *Fundamentals of Forensic DNA Typing* 25, 147-148 (2009) (hereinafter

Butler)). The "noncoding" regions of the DNA that are tested are not known to have any association with a genetic disease, genetic traits, or any other genetic predisposition, and the results are therefore only useful for testing human identity. *King*, 569 U.S. at 445 (quoting Butler 279).

{24} Thus, obtaining an arrestee's DNA furthers the government's interest in correctly identifying the person arrested. According to the United States Supreme Court, the use of DNA for identification purposes "represents an important advance in the techniques used by law enforcement to serve legitimate police concerns for as long as there have been arrests[.]" *King*, 569 U.S. at 456. The most direct "historical analogue" to DNA identification technology is fingerprinting technology, which federal precedent has long held to be "a natural part of 'the administrative steps incident to arrest.' " *Id.* at 437 (quoting *Cty. Of Riverside v. McLaughlin*, 500 U.S. 44, 58 (1991)); *see also United States v. Kelly*, 55 F.2d 67, 69-70 (2d Cir. 1932) (holding that routine fingerprinting during booking of an arrestee did not violate the Fourth Amendment: "[w]e find no ground in reason or authority for interfering with a method of identifying persons charged with crime which has now become widely known and frequently practiced"); *Smith v. United States*, 324 F.2d 879, 882 (D.C. Cir. 1963) (stating that it is "elementary that a person in lawful custody may be required to submit to photographing, and fingerprinting, as part of routine

14

identification processes" (citations omitted)).

{25} The U.S. Supreme Court added that "[a] suspect's criminal history is a critical part of his identity that officers should know when processing him for detention." *King*, 569 U.S. at 450. For example, "[i]t is a well recognized aspect of criminal conduct that the perpetrator will take unusual steps to conceal not only his conduct, but also his identity[,]" including but not limited to name changes and changes to physical features. *Id.* (internal quotation marks and citation omitted). "In this respect the use of DNA for identification is no different than matching an arrestee's face to a wanted poster of a previously unidentified suspect; or matching tattoos to known gang symbols to reveal a criminal affiliation; or matching the arrestee's fingerprints to those recovered from a crime scene." *Id.* at 451. Or in other words, "DNA is [merely] another metric of identification used to connect [an] arrestee with his or her public persona, as reflected in records of his or her actions that are available to the police." *Id.*

{26} Second, "law enforcement officers bear a responsibility for ensuring that the custody of an arrestee does not create inordinate risks for facility staff, for the existing detainee population, and for a new detainee." *Id.* at 452 (internal quotation marks and citation omitted). Specifically, DNA identification can provide "untainted information" concerning whether, for example, an arrestee or detainee has a history

15

of violence or mental disorder. *Id.* at 452.

{27} Third, "looking forward to future stages of criminal prosecution, the Government has a substantial interest in ensuring that persons accused of crimes are available for trials." *Id.* (internal quotation marks and citation omitted). Specifically, "[a] person who is arrested for one offense but knows that he has yet to answer for some past crime may be more inclined to flee the instant charges, lest continued contact with the criminal justice system expose one or more other serious offenses." *Id.* at 453. Similarly, "an arrestee's past conduct is essential to an assessment of the danger he poses to the public," which will inform the determination of whether the individual should be released on bail. *Id.*

{28} Finally, the U.S. Supreme Court said, "in the interests of justice, the identification of an arrestee as the perpetrator of some heinous crime may have the salutary effect of freeing a person wrongfully imprisoned for the same offense." *Id.* at 455.

{29} In considering an arrestee's privacy interests, the Court reasoned that "the intrusion of a cheek swab to obtain a DNA sample is a minimal one." *Id.* at 461. A buccal swab, which consists of a "gentle rub along the inside of the cheek [that] does not break the skin, and it involves virtually no risk, trauma, or pain" is a "minimal" and "brief" intrusion of an arrestee's person as compared to "invasive surgery" or "a

16

search of the arrestee's home," and "does not increase the indignity already attendant to normal incidents of arrest." *Id.* at 463-64 (internal quotation marks and citation omitted). Additionally, "[t]he expectations of privacy of an individual taken into police custody 'necessarily are of a diminished scope[,]' " *id.* at 462 (alteration omitted) (quoting *Bell v. Wolfish*, 441 U.S. 520, 557 (1979)), and searches of a "detainee's person when he is booked into custody may 'involve a relatively extensive exploration[.]' " *King*, 569 U.S. at 462 (quoting *United States v. Robinson*, 414 U.S. 218, 227 (1973), *superseded by statute on other grounds as recognized by Commonwealth v. Pierre*, 72 Mass. App. Ct. 580, 893 N.E.2d 378 (2008)); *see also Florence v. Bd. of Chosen Freeholders of Cty. of Burlington*, 566 U.S. 318, 334 (2012) (stating that booking or intake procedures, including requiring some detainees to "lift their genitals or cough in a squatting position" have been held constitutional).

{30}     Balancing the respective interests, the Court concluded that "[i]n light of the context of a valid arrest supported by probable cause [the defendant's] expectations of privacy were not offended by the minor intrusion of a brief swab of his cheeks. By contrast, that same context of arrest gives rise to significant state interests in identifying [the defendant] not only so that the proper name can be attached to his charges but also so that the criminal justice system can make informed decisions concerning pretrial custody." *King*, 569 U.S. at 465.

{31} Defendant points out that under the Maryland statute construed in *King,* the DNA sample may not be tested or placed in a database until after a judicial officer makes a probable cause determination at arraignment to detain an arrestee on a qualifying "serious offense" (i.e., a crime of violence or an attempt to commit a crime of violence or burglary or an attempt to commit burglary); and the Maryland statute provides for automatic expungement if all the qualifying charges are deemed to be unsupported by probable cause, the criminal action does not result in a criminal conviction, the conviction is finally reversed or vacated, or "the individual is granted an unconditional pardon." *King*, 569 U.S. at 443-44 (internal quotation marks and citation omitted). On the other hand, under the 2006 expansion and current version of the Act, a DNA sample is tested and placed in CODIS upon arrest, and the burden of seeking expungement is placed on the arrestee. Defendant asserts, without explaining why or citing to supporting authorities, that as a result, New Mexico's statutory scheme violates the Fourth Amendment. We do not consider these distinctions as requiring us to conclude that the seizure of Defendant's DNA upon his arrest in 2008 violated the Fourth Amendment to the United States Constitution. *See State v. Guerra*, 2012-NMSC-014, ¶ 21, 278 P.3d 1031 (explaining that the appellate courts are under no obligation to review unclear or undeveloped arguments).

{32} Anticipating this result, Defendant states, "If this Court does not find that the

differences support an opposite result under *King*, however, [Defendant] asks that this Court decide the matter under Article II, Section 10 [of the New Mexico Constitution.]" We therefore turn to Defendant's argument that the seizure of his DNA was in violation of the New Mexico Constitution.

**D.      New Mexico Constitution Arguments**

{33}      Defendant contends that we should diverge from federal precedent and hold the seizure of his DNA was unconstitutional under Article II, Section 10 of the New Mexico Constitution. The parties do not dispute that Defendant has properly preserved this issue to be argued on appeal. *See State v. Ketelson*, 2011-NMSC-023, ¶¶ 10-11, 150 N.M. 137, 257 P.3d 957 (stating that "a defendant must properly preserve his argument under the state constitution" and setting forth the requirements for preservation).

{34}      Article II, Section 10 of the New Mexico Constitution is similar to the Fourth Amendment. It provides: "The people shall be secure in their persons, papers, homes and effects, from unreasonable searches and seizures, and no warrant to search any place, or seize any person or thing, shall issue without describing the place to be searched, or the persons or things to be seized, nor without a written showing of probable cause, supported by oath or affirmation."

{35}      We apply the interstitial approach to determine if our state provision provides

broader protection than the Fourth Amendment because both provisions provide overlapping protections against unreasonable searches and seizures. *See Ketelson*, 2011-NMSC-023, ¶ 10. Under the interstitial approach, "we first consider whether the right being asserted is protected under the federal constitution." *Id.* (internal quotation marks and citation omitted). "If the right is protected by the federal constitution, then the state constitutional claim is not reached." *Id.* If the right is not protected by the federal constitution, "[the appellate courts] next consider whether the New Mexico Constitution provides broader protection, and [the appellate courts] may diverge from federal precedent for three reasons: a flawed federal analysis, structural differences between state and federal government, or distinctive state characteristics." *Id*. (internal quotation marks and citation omitted). Here, we have already concluded that the right Defendant asserts is not protected under the Fourth Amendment. We therefore proceed to consider whether Article II, Section 10 affords Defendant greater rights than the Fourth Amendment.

{36} Defendant makes no argument that we should diverge from federal precedent due to structural differences between state and federal government, or distinctive state characteristics. Defendant does contend, that for the reasons stated in Justice Scalia's dissent in *King*, the analysis and conclusion reached by the majority in *King* is flawed. Defendant also points to *People v. Buza*, 180 Cal. Rptr. 3d 753 (2014), which

20

agreed with the *King* dissent and held that California's DNA collection violates the California constitution. However, the California Supreme Court reversed the Court of Appeals in *People v. Buza*, 413 P.3d 1132 (2018). Finally, Defendant asks us to consider various law review articles, but fails to argue why they should lead us to conclude that the search of Defendant's DNA violates the New Mexico Constitution. We therefore limit our analysis to whether the Scalia dissent in *King* demonstrates that we should grant greater protection to Defendant under Article II, Section 10 because the majority's analysis in *King* is flawed.

{37}    To place Defendant's argument in perspective, we first review how CODIS operates. The CODIS database is composed of profiles of noncoding parts of the DNA that do not reveal genetic traits, and do not, at present, reveal information beyond identification. *King*, 569 U.S. at 445, 464. *See Boroian v. Mueller*, 616 F.3d 60, 66 (1st Cir. 2010) (stating that the resulting DNA profile provides a type of "genetic fingerprint, which uniquely identifies an individual" but no basis "for determining or inferring anything else about the person" (internal quotation marks and citation omitted)); *United States v. Kincade*, 379 F.3d 813, 818 (9th Cir. 2004) (stating that non-genic stretches of DNA are purposely selected for analysis "because they are not associated with any known physical or medical characteristics" (internal quotation marks and citation omitted)). The analysis only generates "a unique

identifying number against which future samples may be matched." *King*, 569 U.S. at 464.

{38} CODIS, according to *King*, connects laboratories at the local, and state level of all "50 States and a number of federal agencies." 569 U.S. at 444-45. The system "collects DNA profiles provided by local laboratories taken from arrestees, convicted offenders, and forensic evidence found at crime scenes." *Id*. at 445. The CODIS database consists of two distinct collections. *Id*. at 472. One consists of DNA samples taken from known arrestees or convicts, and the second consists of DNA samples from unsolved crime scenes. *See id.* at 473. The CODIS system works by checking whether any of the samples from unsolved crime scenes match any of the samples from known arrestees and convicts. *See id.*

{39} The central argument made by Justice Scalia's dissent in *King* is that the primary purpose of CODIS is to obtain known samples of DNA from arrestees so they can then be compared to unknown samples of DNA obtained from unsolved crimes, and thereby determine if a known arrestee was involved in the commission of an unsolved crime. *See id.* at 472-75, 480. Thus, the dissent contends, the majority opinion allows the searching of an arrestee's DNA for evidence of a crime when there is no basis for believing that the arrestee committed an unsolved crime. *See id.* at 466. Because the Fourth Amendment's prohibition against searching a person for evidence

of a crime when there is no basis for believing the person is guilty of the crime is "categorical and without exception" the dissent concludes that the search of an arrestee for a DNA sample is unconstitutional. *Id.* "[S]uspicionless searches are *never* allowed if their principle end is ordinary crime-solving[,]" *id*. at 469, and CODIS is being used for nothing more than investigating ordinary criminal wrongdoing. *Id*. at 468, 472-476.

{40}     Justice Scalia's dissent further argues that the DNA search of an arrestee "had nothing to do" with establishing identity. *King*, 569 U.S. at 474. In *King*, the defendant's identity was known, as the docket for the original criminal charges listed his full name, race, sex, height, date of birth, and address. *Id*. at 473-74. Moreover, the defendant's DNA was not sent to the laboratory for testing until nearly three months after his arrest, and the lab tests were not available for several more weeks, when the results were entered into Maryland's DNA database. *Id*. at 472. Bail had already been set, the defendant had engaged in discovery, and he requested a speedy trial. *Id*. Four months after the defendant's arrest, and after the defendant's identity was already known, CODIS returned the match of the defendant's known DNA with the DNA from the unsolved 2003 rape. *See id.* at 441.

{41}     We now consider whether we should expand privacy rights of New Mexico

23

arrestees beyond those recognized under the Fourth Amendment in *King*. "The key inquiry under Article II, Section 10 is reasonableness[,]" and "reasonableness depends on the balance between the public interest and the individual's interest in freedom from police intrusion upon personal liberty." *Ketelson*, 2011-NMSC-023, ¶ 20. We therefore begin by examining the public interest as expressed in the stated purposes of the Act. Section 29-16-2, as was in effect in 2007, without being further amended states:

The purpose of the Act is to:

A.   establish a DNA identification system for covered offenders and persons required to provide a DNA sample pursuant to the provisions of Section 1 . . . of this 2006 act [NMSA 1978, § 29-3-10 (2007)];

B.   facilitate the use of DNA records by local, state and federal law enforcement agencies in the:

(1)   identification, detection or exclusion of persons in connection with criminal investigations; and

(2)   registration of sex offenders required to register pursuant to the provisions of the Sex Offender Registration and Notification Act . . . ;

C.   establish a missing persons DNA identification system consisting of the following DNA indexes:

(1)   unidentified persons;

(2)   unidentified human remains; and

> > (3) relatives of, or known reference samples from, missing persons; and
>
> > D. facilitate the use of DNA records by local, state and federal law enforcement agencies and the state medical investigator in the identification and location of missing and unidentified persons or human remains.

{42} The first stated purpose of the Act is to "establish a DNA identification" for two classes of persons. 2006 N.M. Laws, ch. 104, § 2(A). "[C]overed offenders" are persons convicted of felonies, and no argument is made here that a convicted felon cannot be constitutionally required to provide a DNA sample for identification purposes. *See* 2006 N.M. Laws, ch. 104, § 2(A). What is before us are the second category of persons required to provide a DNA sample in the DNA identification system. As we have pointed out above, the "persons required to provide a DNA sample" are persons arrested for sex offenses defined as felonies, and all other felonies involving "death, great bodily harm, aggravated assault, kidnapping, burglary, larceny, robbery, aggravated stalking, use of a firearm or an explosive or a violation pursuant to the Antiterrorism Act[.]" 2006 N.M. Laws, ch. 104, § 1(D)(3)(a)-(b). We herein refer to such persons as arrestees.

{43} It is fundamental that the State has a right to identify all persons it has arrested for committing a felony. *See Hiibel v. Sixth Judicial Dist. Ct. of Nev., Humboldt Cty.*, 542 U.S. at 191 ("In every criminal case, it is known and must be known who has

been arrested and who is being tried."). Defendant makes no argument that a person arrested for a felony has a greater privacy right to his or her identifying information under the New Mexico Constitution than one does under the United States Constitution, nor is any argument made that the method for obtaining Defendant's DNA violated the New Mexico Constitution. We agree with *King* that weighing the law enforcement need against the minimally invasive means for securing the DNA sample from Defendant's cheek weighs in favor of concluding that the search is reasonable under Article II, Section 10. In addition, no argument is made why the State should be deprived, constitutionally, from using the most accurate method available for identifying persons arrested on felony charges. As our discussion of *King* illustrates, DNA testing identifies with "near certainty" a person's identity, and it does so by testing only the "noncoding" regions of the DNA strand that are not known to be associated with any genetic disease or genetic traits. 569 U.S. at 442-43. The tests are therefore only useful for human identification. Finally, no argument is made that the New Mexico Constitution affords specific protection on how the identifying DNA information may be stored.

{44} Rather, Defendant's argument seems centered on the Acts's second purpose, which is to "facilitate the use" of the DNA records in the "identification, detection or exclusion of persons in connection with criminal investigations[.]" Section 29-16-

26

2(B)(1). This stated purpose, Defendant contends, demonstrates that the purpose for collecting DNA is to use the DNA collected from arrestees to investigate whether they have committed other, unknown crimes when there is no reason to believe they committed any other crimes. While this use does not violate the Fourth Amendment under *King*, Defendant contends we should conclude it violates Article II, Section 10 of the New Mexico Constitution. We are not persuaded.

{45}    The argument overlooks the fact that the State has obtained an arrestee's DNA in a manner that is both lawful and consistent with the New Mexico Constitution. The *real* complaint is that other information, lawfully in the State's possession—DNA from unsolved crime scenes—can be compared to the arrestee's known DNA. A defendant has no constitutionally protected privacy interest in DNA he or she leaves at a past or future crime scene, and a defendant has no constitutionally protected interest in the DNA used for identification at booking upon arrest. Under these circumstances, we do not perceive a constitutional violation. Obviously, the comparison of known DNA, obtained at booking, with unknown DNA, seized from unsolved crime scenes, is exactly the same use that has been made of fingerprints for decades. Even Justice Scalia's dissent in *King* recognizes that such use has not been deemed to be an unconstitutional privacy violation. *King*, 569 U.S. at 477-79.

{46} For the foregoing reasons, we hold that the initial collection of a DNA sample as part of a routine booking procedure, and its subsequent use under CODIS does not violate Article II, Section 10 of the New Mexico Constitution.

## III. Arguments Summarily Answered

## A. Search Warrant Issued by Impartial Judge

{47} Pursuant to *State v. Franklin*, 1967-NMSC-151, ¶ 9, 78 N.M. 127, 428 P.2d 982 (stating that "appointed counsel should set forth contentions urged by a petitioner whether or not counsel feels they have merit and whether such contentions are in fact argued by counsel"); and *State v. Boyer*, 1985-NMCA-029, ¶¶ 17-24, 103 N.M. 655, 712 P.2d 1 (expressing same principle), Defendant contends that the December 4, 2010 search warrant for a DNA sample was invalid because it was not issued by a neutral and detached judge. The issue was raised in Defendant's motion to suppress which the district court denied. Importantly, Defendant does not argue that the search warrant is not supported by probable cause.

{48} Defendant fails to establish factually or legally that the judge who issued the December 4, 2010 search warrant was legally disqualified from issuing the search warrant. We therefore do not consider this issue further. *See Guerra*, 2012-NMSC-014, ¶ 21 (explaining that the appellate courts are under no obligation to review unclear or undeveloped arguments).

28

## B. Statute of Limitations

{49} Defendant argues that the 1997 amendment to NMSA 1978, Section 30-1-8(I) (2009) which eliminated the statute of limitations for all first degree felonies does not apply to his case, and that he was entitled to the fifteen year statute of limitations for first degree felonies under the 1979 version of Section 30-1-8(B). The issue was preserved in Defendant's motion to dismiss which the district court denied.

{50} "When facts relevant to a statute of limitations issue are not in dispute, the standard of review is whether the district court correctly applied the law to the undisputed facts." *State v. Kerby*, 2007-NMSC-014, ¶ 11, 141 N.M. 413, 156 P.3d 704 (internal quotation marks and citation omitted). Interpretation of the statute of limitations in this context is therefore a legal question subject to de novo review. *See id.* Because the parties stipulated to the facts material to Defendant's statute of limitations claim, our review of Defendant's statute of limitations argument is de novo.

{51} Defendant's argument is answered by *State v. Morales*, 2010-NMSC-026, 148 N.M. 305, 236 P.3d 24. In *Morales*, our Supreme Court considered whether the 1997 amendment to Section 30-1-8 applied to crimes committed before July 1, 1997, the effective date of the amendment. *Id.* ¶ 1. The Court held:

> Although the extension of a statute of limitations cannot revive a previously time-barred prosecution, we conclude that it can extend an unexpired limitation period because such extension does not impair

29

vested rights acquired under prior law, require new obligations, impose new duties, or affix new disabilities to past transactions. Because capital felonies and first-degree violent felonies committed after July 1, 1982, were not time-barred as of the effective date of the 1997 amendment, we hold that the Legislature intended the 1997 amendment to apply to these crimes.

*Id.* (citation omitted). In other words, if the alleged crime was not time-barred under the fifteen year statute of limitations when the 1979 amendment of Section 30-1-8 became effective, then the 1997 amendment, with no limitations period applied. In cause no. 4089, the indictment alleged that the crimes were committed on November 2, 1988, meaning that the fifteen year statute of limitations would have expired in 2003, which was after the 1997 amendment became effective. Therefore, under *Morales*, the 1997 version of Section 30-1-8 with no statute of limitations applied. The same result is reached in cause no. 1243. The indictment alleges that the crimes were committed on October 7, 1990, June 7, 1993, and November 25, 1993, respectively. Fifteen years from each of these dates is 2005, 2008, and 2008, all of which are after the effective date of the 1997 amendment to Section 30-1-8.

{52}     Defendant's attempts to distinguish *Morales* on the basis that application of the 1997 version of Section 30-1-8 is unconstitutional because "a right of action had accrued upon discovery, which occurred at the time these crimes were reported" and therefore the statute of limitations expired fifteen years after the crimes were reported is not supported by any authorities, is not persuasive, and is rejected. Finally,

30

Defendant argues, pursuant to *Franklin* and *Boyer*, that because "the cause of action accrued at the time of discovery, the application of the 1997 amendment to [Defendant] is an ex post facto application of that law and is unconstitutional." We reject this argument as well. *See Guerra*, 2012-NMSC-014, ¶ 21 (rejecting the defendant's undeveloped and unprecedented construction that lacked "any principled analysis").

**C.    Speedy Trial**

{53}    Defendant's final claim is that the delay in bringing his case to trial amounted to a violation of his right to a speedy trial. The State responds that Defendant failed to preserve his speedy trial claim for appeal. We agree.

{54}    "It is well-settled law that in order to preserve a speedy trial argument, [the d]efendant must properly raise it in the lower court and invoke a ruling." *State v. Lopez*, 2008-NMCA-002, ¶ 25, 143 N.M. 274, 175 P.3d 942; *State v. Graham*, 2003-NMCA-127, ¶ 29, 134 N.M. 613, 81 P.3d 556 (stating that because the defendant's speedy trial "issue was not properly raised in district court, and [the d]efendant never invoked a ruling, the defendant's speedy trial argument was not preserved" on appeal), *rev'd on other grounds by* 2005-NMSC-004, ¶ 1, 137 N.M. 197, 109 P.3d 285.

{55}    Defendant asserted his right to a speedy trial when counsel entered his

appearance on April 6, 2011. Defendant also filed a motion to dismiss for a violation of his right to a speedy trial on May 18, 2015. The district court, however, denied Defendant's motion without a hearing because the motion was untimely under the August 28, 2014 scheduling order, which directed that all motions in the case be filed by December 1, 2014. Accordingly, we conclude that Defendant failed to preserve his speedy trial claim for appellate review.

**IV.    CONCLUSION**

{56}    The judgment and sentence in each of these cases is affirmed.

{57}    **IT IS SO ORDERED.**

_____
**MICHAEL E. VIGIL, Judge**

**WE CONCUR:**

_____
**M. MONICA ZAMORA, Judge**

_____
**STEPHEN G. FRENCH, Judge**

32